## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

K.Y., a minor, by and through his next friend, and
D.J., a minor, by and through his next friend;
*on behalf of themselves and others similarly
situated*,
Youth Services Center,
1000 Mount Olivet Road, NE
Washington, D.C. 20002,

       *Plaintiffs*,

     v.

DISTRICT OF COLUMBIA,
a municipal corporation, and
1350 Pennsylvania Avenue, NW
Washington, D.C. 20004

SAM ABED, *in his official capacity as Director
of the District of Columbia Department of Youth
Rehabilitation Services*,
450 H Street, NW
Washington, D.C. 20001

       *Defendants*.

Case No.

---

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(failure to timely place children in youth detention into rehabilitative placements)

## INTRODUCTION

This case is about the District of Columbia's blatant failure to meet the rehabilitative and treatment needs of children in its custody and the District's practice of needlessly and unlawfully extending the time children spend in jail-like settings.

The District of Columbia's juvenile delinquency system is designed to be centered on rehabilitation over punishment. "[I]t was created to be something other than the adult criminal system," *In re N.H.M.*, 224 A.3d 581, 589 (D.C. 2020), and to "treat children as children in all phases of their involvement," D.C. Code § 16-2301.02. It seeks to "promote youth development," "preserve and strengthen families," "place a premium on the rehabilitation of children," and "hold the government accountable for the provision of reasonable rehabilitative services." D.C. Code § 16-2301.02(2), (3), (5), (7). These goals are to be achieved in the "least restrictive settings necessary." *Id.* § 16-2301.02(9).

In line with these principles, when a child is "found to be delinquent," the Family Division of the Superior Court determines the disposition that "will be in the best interest of the child." D.C. Code § 16-2320(c). That disposition may be "[t]ransfer of legal custody to a public agency for the care of delinquent children," referred to as commitment to the Department of Youth Rehabilitation Services ("DYRS"). *Id.* § 16-2320(c)(2). Commitment vests DYRS with the responsibility to care for the child and meet the child's rehabilitative needs. *See* D.C. Code § 16-2301(21) (defining "legal custody"); *id.* § 16-2301(6) (defining "delinquent child" as a child "in need of care or rehabilitation"). DYRS must do so by placing the child in an appropriate setting that can meet the child's rehabilitative needs—a process referred to as "placement." These locations range from high-level placements (which include secure facilities, meaning highly-restrictive and locked residential facilities, such as residential treatment centers and psychiatric

residential treatment facilities), medium-level placements (which include group homes in the community), and low-level placements (which include a family or guardian's home).

This placement process has entirely broken down. DYRS utterly fails to meet the duty it owes to children in its custody who are awaiting placements. DYRS delays each child's assessment and the development of each child's individualized treatment plan, and sometimes never conducts assessments or creates plans at all. These failings result in delays to each child's placement in a facility that can meet the rehabilitative and treatment needs of the child. These delays last for months, and all the while, the children awaiting placement languish at the Youth Services Center ("YSC")—a jail-like facility that is crowded, violent, and harmful to children at a critical time in their development. Detention in such a facility is at odds with a system that emphasizes using detention as a last-resort, and prioritizes keeping children in the "least restrictive settings necessary," D.C. Code § 16-2301.02(9). *See* D.C. Code § 2-1515.04(6) (DYRS's duty to "establish[] a system that . . . ensures placement within a continuum of least restrictive settings"). As DYRS Director Sam Abed has explained at a D.C. Council Committee roundtable, YSC is "not a treatment facility, it's a detention center."[1] It is "akin to a jail in the adult system" and jails like YSC are "not designed for treatment. Their purpose is to hold you pre-trial."[2] YSC thus does not, and cannot, provide the type of rehabilitative services and programming that children need and to which they are legally entitled.

The harm resulting from these failures is vast. While at YSC, children are left in restrictive, often overcrowded settings without access to rehabilitative programming and services, at great

---

[1] Testimony of Sam Abed, *Joint Oversight Roundtable: Public Safety & Behavioral Health Services and Support for Youth*, Council of the District of Columbia, Comms. on Health, Judiciary & Youth Affairs (Dec. 13, 2023), available at https://www.youtube.com/watch?v=-Md8K6vFG2k (7:01:18).
[2] *Id.* at 7:02:05.

harm to their mental, emotional, and physical well-being.  Not only are children left with uncertainty as to their future and forced to endure the stressful conditions at YSC while awaiting placement, but these delays also unlawfully prolong children's detention, as they extend the overall time that children are held in restrictive settings.  This results in children being separated from their communities and families for longer than necessary and compounds the known harms of detention on children's emotional and neurological development.  *In re K.G.*, 178 A.3d 1213, 1218–19 (D.C. 2018).

DYRS's failures violate D.C. Code § 16-2319, which provides strict deadlines DYRS must follow in assessing a child and developing an individualized treatment plan—deadlines the agency consistently fails to meet.  DYRS's failures also violate the children's due process rights in two ways.  First, placement delays violate due process because they deny children the treatment and rehabilitative services to which they are entitled and which are the entire point of their commitment to DYRS custody.  Second, forcing children to languish for needless months in YSC subjects them to unconstitutional punishment by extending the overall time they must spend in secure detention settings.  Children cannot begin accruing credit toward their release into less restrictive placements unless and until they begin their rehabilitative work at their initial placement.

Plaintiffs' experiences awaiting placement at YSC illustrate these systemic failures. Plaintiffs K.Y. and D.J. are both sixteen years old and awaiting high-level placements.  K.Y. has been waiting since July 29, 2024, and D.J. has been at YSC awaiting placement since September 4, 2024.  K.Y. has trouble sleeping at night due to his PTSD.  Although DYRS determined that K.Y. requires a placement that can provide him individualized therapy, he has been held at YSC— where he has no access to such a service—for three months and counting.  As one parent of a child awaiting placement has stated: "I don't even have words for it at this point . . . One hundred percent

broken."[3]  Plaintiffs and putative class members cannot afford to wait any longer for this broken system to be fixed, and now seek judicial intervention.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1367, as this case raises claims arising under the Constitution of the United States, and the remaining claims are part of the same case or controversy as the constitutional claims.

2.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–02 and the inherent equitable powers of this Court.

3.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants are located in this judicial district and Plaintiffs' claims for relief arose in this district.

## PARTIES

4.     Plaintiff K.Y. is sixteen years old and has been held in awaiting placement status at YSC since July 29, 2024.  He sues by and through his next friend, his mother Jane Doe.

5.     Plaintiff D.J. is sixteen years old and has been held in awaiting placement status at YSC since September 4, 2024.  He sues by and through his next friend, his mother Jane Roe.

6.     Defendant Sam Abed is the Director of DYRS and is being sued in his official capacity.  As the Director, he is responsible for the administration of DYRS, including its assessment, planning, and placement processes as well as the administration of its secure facilities, such as YSC.  Director Abed is also responsible for ensuring the agency complies with the law.

7.     Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C.  It operates and governs DYRS pursuant to the laws of the District of Columbia.

---

[3] Erick Flack & Jordan Fischer, *"We need some help," Mother, Judges Say System is Failing DC Kids Who Need Mental Health Treatment*, WUSA9 (July 12, 2024), https://www.wusa9.com/article/news/crime/mother-judges-say-system-is-failing-dc-kids-who-need-mental-health-treatment/65-f1d4540c-27b9-46d6-97de-ea627e432f77.

## FACTUAL BACKGROUND

**I.      The District's Juvenile System is Focused on Rehabilitation.**

8.      The District's juvenile system is premised on "treat[ing] children as children in all phases of their involvement."  D.C. Code § 16-2301.02.

9.      To that end, the system's focus is on youth development and rehabilitation, as opposed to punishment and retribution.

10.     The mandate that children in the juvenile system be provided with rehabilitative services is unequivocal.  The "goals" for delinquency cases include "plac[ing] a premium on the rehabilitation of children with the goal of creating productive citizens," and "hold[ing] the government accountable for the provision of reasonable rehabilitative services."  D.C. Code § 16-2301.02; *id.* §§ 16-2301.02(5), (7).  Indeed, the statute defines a "delinquent child" as "a child who has committed a delinquent act *and is in need of care or rehabilitation*."  *Id.* § 16-2301(6) (emphasis added).

11.     This rehabilitative mandate is reinforced at every single step of the juvenile process. At the outset, a petition alleging delinquency in the Family Division of the Superior Court of the District of Columbia ("Family Court") must include a statement "that the child appears to be in need of care or rehabilitation."  D.C. Code § 16-2305(d).  "[A]t or after the dispositional hearing," the Family Court must specifically make a determination as to whether the "child is in need of care or rehabilitation."  *Id.* § 16-2317(d).  And if a child is found to be delinquent, the Family Court's dispositional authority extends to "any natural person who is a parent or caretaker . . . to secure [their] full cooperation and assistance in the entire rehabilitative process[.]"  *Id.* § 16-2320(c). After a dispositional order is entered, the rehabilitative obligation continues: the statute requires either Court Social Services or DYRS, "whichever is responsible for supervision of the disposition

order" to "conduct periodic evaluations" to "[d]etermine if rehabilitative progress has been made and if the services provided to the child have been effective" as well as "what steps, if any, should be taken to ensure the rehabilitation and welfare of the child[.]" *Id.* §§ 16-2323(g)(1), (2).

12.    In light of the system's rehabilitative, rather than punitive, purpose, its goals are to be "achieve[d] . . . in the least restrictive settings necessary, with a preference at all times for the preservation of the family and the integration of parental, guardian, or custodial accountability and participation in treatment and counseling programs." D.C. Code § 16-2301.02(9).

13.    This statutory scheme is "in keeping with" research on adolescent brain development that "indicates that detaining children for poor decisionmaking to punish or educate them is simply ineffective and may be counterproductive." *In re K.G.*, 178 A.3d at 1218 (citing Council Comm. on the Judiciary, Report on Bill 21–0683, at 3 (Oct. 5, 2016) ("Committee Report")).

14.    In fact, the D.C. Council and the D.C. Court of Appeals have acknowledged that the "detention of juveniles 'can actually increase recidivism [and] pull youth deeper into the justice system.'" *In re K.G.*, 178 A.3d at 1219 (quoting Committee Report, at 9).

## II.    DYRS Is Responsible for Effectuating the Rehabilitative Purpose of D.C.'s Juvenile System.

15.    If a child is adjudicated involved in a delinquent act, the Family Court holds a dispositional hearing to determine how the child's rehabilitative needs should be met. This includes the determination of whether to place the child on probation, which is overseen by Court Social Services, or to commit the child to DYRS custody, as well as the duration of any such commitment. *See* D.C. Code § 16-2320(c).

16.    The decision to commit a child to DYRS custody requires a prior finding that the child "is in need of care or rehabilitation." D.C. Code § 16-2301(6).

17.    The Family Court's decision is informed by a report by Court Social Services "concerning the child, the child's family, the child's environment, and other matters relevant to the need for treatment or disposition of the case."  *See* D.C. Code § 16-2319(a).

18.    When the Family Court commits a child to DYRS custody, DYRS becomes entirely responsible for meeting the child's rehabilitative needs, as well as for the overall care of the child. *See* D.C. Code § 16-2320(c)(2) (providing that commitment involves the "[t]ransfer of legal custody" to DYRS); *id.* § 16-2301(21) (noting that "legal custody" means the vesting of "the responsibility for the custody of a minor").

19.    Given the system's goal of "treat[ing] children as children in all phases of their involvement," D.C. Code § 16-2301.02, the purpose of commitment is not to detain or punish the child but to rehabilitate them.  Indeed, DYRS was created to "[i]mprove the security, supervision, and rehabilitation services provided to committed and detained juvenile offenders."  *Id.* § 2-1515.02(a)(1).  Its primary duties include operating a "juvenile justice system of care, rehabilitative service delivery, and security that meets the treatment needs of youth within the juvenile justice system." *Id.* § 2-1515.04.

20.    One of DYRS's primary duties is to determine and secure an appropriate placement for a child to go to that will provide the necessary services and treatment.

21.    The types of placements vary depending on each child's needs and range from low-level placements, which can include placement at home with a parent or guardian, to high-level placements, which are "secure" placements.  *See* DCMR § 29-1299 (defining a secure facility as "a locked residential placement which provides treatment and/or educational programs within the facility and does not allow for unsupervised movement within or outside of the facility").

22.    High-level placements include New Beginnings Youth Development Center, residential treatment centers, as well as psychiatric residential treatment facilities ("PRTFs"), which can focus on the psychiatric and therapeutic needs of children who have experienced trauma, mental health diagnoses, and/or substance abuse challenges.

### III.    DYRS Systematically Delays Placing Children at Facilities Capable of Providing Them with Appropriate Services and Care.

23.    In the past, DYRS conducted timely assessments of children in its custody and made placements in a matter of weeks.

24.    Expeditious placements are in line with the law's imposition of a swift and strict timeline.  Specifically, D.C. law mandates that DYRS "complete an initial assessment of the child within 3 days of taking legal custody" and "develop the individualized treatment plan within 14 days" of the assessment.  D.C. Code § 16-2319(f).  Any extensions to these deadlines must be "justified in writing in the child's initial assessment."  *Id.*

25.    This planning process is meant to be swift.  As DYRS Director Sam Abed explained at a September 25, 2024 D.C. Council hearing, "once youth are committed to DYRS, we must get them into their treatment program as soon as possible."[4]

26.    In recent years, DYRS's process for assessing children and making placements has entirely broken down.

27.    DYRS first becomes aware that a child may be committed to its custody weeks before the dispositional hearing, when Court Social Services or the Court files a Notice of Intent to Commit ("Notice").

---

[4]  Testimony of Sam Abed, *Public Hearing on the B25-0826 ROAD Act*, Council of the District of Columbia, Comm. of the Whole (Sep. 25, 2024), available at https://lims.dccouncil.gov/Hearings/hearings/496.

28.    Though DYRS purports to have a "pre-commitment phase" beginning with the Notice that "thoroughly assess[es] and determine[s] the most appropriate rehabilitation plan for a youth,"[5] in reality, DYRS squanders the time it has before the dispositional hearing.  It delays assessing children or developing individualized treatment plans in a timely manner.

29.    The delays continue after commitment.  Even though the statute requires an initial assessment to occur within three days, D.C. Code § 16-2319(f), children wait weeks or months to even meet with a DYRS employee to complete an assessment or get information about when and where they may be placed.

30.    For some committed youth, DYRS never completes an assessment or develops an individualized treatment plan.

31.    Children wait months for DYRS to assess their rehabilitative needs and secure appropriate placements that can meet those needs—these children are commonly referred to as the "awaiting placement" population.  The awaiting placement population includes children who DYRS is sending to high-level placements, or placements with a high level of restrictiveness.  These placements are secure facilities—such as a residential treatment center or a PRTF—that provide services needed for the child's rehabilitation and care.

32.    The awaiting placement population also includes children who are waiting to go to placements with a medium level of restrictiveness.  DYRS has determined that these children are to receive rehabilitative services in less restrictive, community-based placements, and thus should not be in secure detention.  However, they also wait months at YSC before DYRS releases them to appropriate placements.

33.    All the while, children awaiting placement are held at YSC, a secure detention center.

_____

[5] DYRS, *Care Coordination*, https://dyrs.dc.gov/page/care-coordination (last visited Oct. 27, 2024).

34.    YSC is not a substitute for any placement.  It is not a therapeutic setting, and it does not provide for the longer-term treatment necessary to reach the rehabilitative goals of commitment.  Nor does it move a child closer to the ultimate goals of the system: returning to the community with the skills necessary to succeed.  Instead, it is functionally a youth jail, designed to house children pending adjudication or disposition.

35.    Sam Abed, Director of DYRS, explained at an Oversight Roundtable for the Committees on Health, Judiciary & Youth Affairs, that "detention [at YSC] should be for pretrial youth" rather than children awaiting placement, as YSC is "not a treatment facility, it is a detention center."[6]  At a June 2024 hearing in Family Court, Director Abed reiterated that YSC is "a detention center primarily for youth that are awaiting" disposition and that DYRS cannot "attempt[] to transform a detention center into a treatment center."

36.    DYRS's delays in moving children from YSC to appropriate placements have dramatically worsened.  Despite Director Abed's assertion that all children should be placed within 30 days of commitment,[7] DYRS is failing to complete case *planning* for placement within 90 days—three times longer than the agency believes it should take to *place* a child.

37.    In Fiscal Year 2023, only 45.3% of newly committed youth—less than half— underwent "a complete case planning process within 90 days of their commitment start date."[8]

---

[6]  Council of the District of Columbia, Committees on Health, Judiciary & Youth Affairs, Joint Oversight Roundtable on Public Safety & Behavioral Health Services and Support for Youth, at 6:59:50 and 7:01:18 (Dec. 13, 2023) (Statement of Sam Abed), available at https://www.youtube.com/watch?v=-Md8K6vFG2k.

[7] DYRS, *DYRS FY23 Performance Oversight Pre-Hearing Question Responses* 12 (Feb. 12, 2024), https://dccouncil.gov/wp-content/uploads/2024/08/DYRS-FY23-24-Oversight-Pre-Hearing-Questions_FINAL.pdf ("DYRS's goal is to reduce [the placement timeline] to under 30 days.").

[8]  DYRS, *FY 2024 Performance Plan* 7 (Dec. 1, 2023), https://oca.dc.gov/sites/default/files/dc/sites/oca/page_content/attachments/Department%20of%20Youth%20Rehabilitation%20Services_2023-12-01.pdf.

This is a more than 50% decrease from Fiscal Year 2022, during which 92.5% of newly committed youth underwent a complete case planning process within 90 days.[9]

38.    Defendant Abed has acknowledged these long wait times, and in February 2024, expressed an interest in "[r]educing length of stay for awaiting placement youth."[10]  Despite this, DYRS has made little to no progress on the issue.

39.    These delays have become widely recognized by individuals involved in the District's juvenile system.

40.    On February 14, 2024, members of the juvenile defense bar wrote to DYRS Director Abed to "express [their] grave concern regarding the pattern and practice of [DYRS] warehousing committed children at [YSC] for months as they await placement at appropriate facilities."  They stated that "[d]espite [his] assertion that all children should be placed within, ideally, 30 days of commitment," they "have witnessed the wait times grow longer and longer while the communication between DYRS staff, families and attorneys of record continues to deteriorate," and while children are left "at YSC with no meaningful programs, supports, or psychological security surrounding the next phase of their lives."

41.    That same month, the D.C. Council Committee on Recreation, Libraries, and Youth Affairs held a DYRS oversight hearing at which testimony was presented regarding the "40 committed youths . . . awaiting placement," and the "missteps that arise when DYRS youths await placement," including DYRS "squander[ing] weeks of prep time needed to determine rehabilitative care, find and implement an appropriate program, order assessments and coordinate

---

[9] *Id.*
[10] Testimony of Sam Abed, Fiscal Year 2023 Performance Oversight Hearing on The District of Columbia Department of Youth Rehabilitation Services (Feb. 15, 2024), https://dyrs.dc.gov/sites/default/files/dc/sites/dyrs/release_content/attachments/DYRS%20FY23%20Performance%20Oversight%20Hearing%20Testimony_2.15.24.pdf.

care."[11]  Director Abed was in attendance at the hearing and had submitted pre-hearing responses confirming his awareness of the problem by specifying that one of the agency's "top five priorities" is "reducing the length of stay . . . for youth awaiting placement and housed at Youth Services Center."[12]

42.  Months after this hearing, the Office of the Attorney General ("OAG"), the entity tasked with prosecuting children in delinquency matters, introduced legislation to force DYRS to move more quickly, expressing "'concern[] about [DYRS's] direction'" and dissatisfaction with its delays.[13]  The OAG deemed the proposed legislation "necessary" in light of "long delays in getting appropriate treatment for young people" in the delinquency system, "which can make them more vulnerable to recidivism."[14]

43.  A month later, in June 2024, a Superior Court judge requested that Director Abed attend a hearing in Family Court to address "pressing questions with respect to . . . what's happened with respect to [the child's] placement and the rehabilitative efforts that were being made since he was committed … and even before that, since the notice of intent to commit was issued."  The court noted that "DYRS was acknowledging that it fell short on the timeliness of fully implementing the complete complement of rehabilitative service recommendations outlined [for the child]," a conclusion that Director Abed accepted as well.  The court stated that what happened

---

[11] Sam P.K. Collins, *DYRS Budget Oversight Hearing Sheds Light on Treatment, Staffing Gaps*, Wash. Informer (Feb. 20, 2024), https://www.washingtoninformer.com/dyrs-budget-oversight-hearing-sheds-light-on-treatment-staffing-gaps/.

[12] Sam Abed, Director of DYRS, to Councilmember Trayon White, Chairperson of Committee on Recreation Libraries and Youth Affairs, *DYRS FY23 Performance Oversight Pre-Hearing Question Responses* 12 (Feb. 12, 2024), https://dccouncil.gov/wp-content/uploads/2024/08/DYRS-FY23-24-Oversight-Pre-Hearing-Questions_FINAL.pdf.

[13] Emily Davies, *D.C. Attorney General Targets Youth Services Agency in New Legislation*, Wash. Post (May 21, 2024), https://www.washingtonpost.com/dc-md-va/2024/05/21/dc-youth-crime-rehabilitation-legislation/.

[14] *Id.*

in the child's case "is emblematic of what I've seen happen in dozens and dozens and dozens of cases of committed youth who sit at YSC once they've been committed to the care of the Department of Youth Rehabilitation Services" and receive insufficient services, which Director Abed acknowledged as well.

44.    Just last month at a D.C. Council Hearing, Attorney General Brian Schwalb stated that "[t]oo many committed youth are being securely detained, lingering too long without an individualized rehabilitation plan and not getting services they need."[15]

45.    Despite the broad recognition of these failings and the need for change, the problem persists.

46.    Current, available data confirms these failings.  As of October 26, 2024, there were 22 children committed to DYRS's custody sitting at YSC and awaiting placement for rehabilitative services.  Of those 22 children, two have been waiting 29-60 days, five have been waiting 61-90 days, and seven have been waiting 91-180 days.[16]  In other words, 32% of the children at YSC who are committed to DYRS's custody have—as of the date of this filing—been waiting over three months and some up to six months to be provided services in an appropriate placement.

## IV.    Placement Delays Harm Children by Extending the Time Spent at YSC—a Jail Not Designed to Meet Their Rehabilitative Needs—As Well As the Overall Time Spent in Secure Detention.

47.    DYRS's failures to conduct timely assessments, create plans, and provide timely placements cause children in DYRS's legal custody to endure prolonged detention at YSC.

---

[15] Meagan Flynn, *D.C. mayor, attorney general at odds over juvenile justice reform*, Wash. Post (Sep. 28, 2024), https://www.washingtonpost.com/dc-md-va/2024/09/28/dc-juvenile-crime/.
[16] Office of Independent Juvenile Justice Facilities Oversight, *DYRS Secure Facilities Population Data Over Time*, https://oijjfo.dc.gov/page/dyrs-secure-facilities-population-data-over-time.

48.    Consequently, DYRS's failures (1) obstruct children's access to rehabilitative resources, treatment, and care, and (2) extend the period of time children spend in jail-like settings in contravention of the goals and purpose of the District's juvenile system.

49.    YSC functions as a jail and is not a substitute for any rehabilitative placement.  The facility is restrictive, has limited outdoor space, and provides minimal therapeutic or other programming.  It is not equipped to provide the rehabilitative services required for committed youth.

50.    To the contrary, YSC is a "long-troubled facility," that has been plagued with issues of overcrowding, insufficient staffing, access to drugs, violence, and extensive lockdowns—a particularly harmful environment for children identified as being in need of treatment and rehabilitative care, as all children who are awaiting placement are.[17]

51.    Throughout 2024, the population at YSC has hovered near, and occasionally exceeded, the facility's capacity of 98.[18]  By contrast, in 2021 and 2022, the population at YSC was consistently in the 50s.[19]

52.    Each month of 2024 also saw between 21 and 59 critical incidents; a critical incident is one "that poses a risk of serious harm to youth and/or staff."[20]  YSC "was the site of 14 assaults across just two days" earlier in May, "with four victims suffering serious injuries."[21]  There have

---

[17] Ted Obert, *14 Fights, 8 Arrests, 4 Positive Drug Tests in Recent Days at D.C.'s Secure Youth Services Center*, NBC4 Washington (May 15, 2024), https://www.nbcwashington.com/investigations/14-fights-8-arrests-4-positive-drug-tests-in-recent-days-at-dcs-secure-youth-services-center/3616123/.

[18] Office of Independent Juvenile Justice Facilities Oversight, *DYRS Secure Facilities Population Data Over Time*, https://oijjfo.dc.gov/page/dyrs-secure-facilities-population-data-over-time.

[19] *Id.*

[20] Office of Independent Juvenile Justice Facilities Oversight, *Incident Rates*, https://oijjfo.dc.gov/page/incident-rates.

[21] Christian Flores, *DYRS director reveals more positive drug results in DC juvenile detention center*, ABC7 News (May 21, 2024), https://wjla.com/news/local/dc-juvenile-detention-center-positive-drug-tests-fentanyl-department-youth-rehabilitation-sam-abed-violence-youth-services-

also been "four positive drug tests since April, three for opioids and one that resulted in staffing having to use Narcan on a juvenile in custody."[22]  In September 2024, there were 25 assaults and 21 critical incidents at YSC.[23]

53.    Staff shortages and overcrowding often also result in the entire facility getting locked down, with children stuck in their cells for extended periods of time.[24]  On a few occasions over the past year, there have been entire weekends where the children at YSC were locked in their cells for the whole day, resulting in solitary confinement prohibited by law.  *See* D.C. Code § 24-912(a) ("secure juvenile facilities shall not use room confinement on a juvenile for the purposes of discipline, punishment, administrative convenience, retaliation, or staffing shortages.").  The overcrowding also leads to restricted access to outdoor space, gyms, lack of in-person education, personal or legal visits, and timely medical attention.

54.    It is abundantly clear that YSC is no place for youth legally determined to be "in need of care and rehabilitation" to languish as DYRS straggles to find them placements where they can receive appropriate services.  D.C. Code § 16-2301(6).

55.    DYRS's failure to place children in appropriate placements has exacerbated issues of overcrowding at YSC because it contributes to the total number of children detained.  Further, it has increased the number of children with high needs who are held at YSC—a facility meant solely for children held pre-disposition.  In fact, Defendant Abed has lamented that the agency has "too many different populations to serve" at YSC.[25]

---

center-injuries-safety-testimony-dmv.
[22] *Id.*
[23] Office of Independent Juvenile Justice Facilities Oversight, *Incident Rates*, https://oijjfo.dc.gov/page/incident-rates.
[24] Jenny Gathright & Colleen Grablick, *"Why is my child always on lockdown?": Confinement at D.C.'s Youth Jail Worries Parents, Advocates*, WAMU (July 24, 2023), https://wamu.org/story/23/07/24/confinement-at-dc-youth-jail-has-parents-worried/.
[25] Christian Flores, *DYRS director reveals more positive drug results in DC juvenile detention*

56. In addition to denying children the rehabilitative services to which they are entitled, extended confinement at YSC also extends the length of a child's *overall* secure detention.

57. The purpose of commitment in the juvenile system is not to detain children for a term of months or years as punishment, but to provide rehabilitative services to ensure that children can return to the community with the tools they need to succeed. Because DYRS commitment cannot extend past the age of 21, every child committed to DYRS custody will eventually return to the community.

58. Thus, through the course of commitment, a child in DYRS custody can be moved to less restrictive placements as they progress through the programming and treatment goals of their respective placements. In other words, when provided with appropriate treatment, even children initially deemed in need of high-level placements in secure facilities can and should ultimately end up in lower-level placements, including community placements or even their family home, prior to the termination of commitment.

59. But children cannot begin this process of programming, and earning less-secure placements, until they leave YSC and enter a placement that allows them to begin working towards the goals set out for them. Indeed, in light of this, those familiar with the system refer to time spent at YSC following commitment as "dead time"—time that is spent in secure detention but that does not go towards rehabilitation and does not contribute to the process of earning less-secure placements in the community, and ultimately, to going home.

---

*center*, ABC7 News (May 21, 2024), https://wjla.com/news/local/dc-juvenile-detention-center-positive-drug-tests-fentanyl-department-youth-rehabilitation-sam-abed-violence-youth-services-center-injuries-safety-testimony-dmv.

60.     As a result, Defendants' delays in conducting assessments, developing individualized treatment plans, and securing placements delays a child's process of rehabilitation, which then prolongs the time a child spends in secure facilities—through no fault of the child's.

61.     Prolonged secure detention is particularly egregious for children who are awaiting medium- or low-level placements.  These children have been deemed to require a lesser level of restrictiveness, and so prolonged secure detention at YSC is markedly ill-matched to their needs.

62.     Prolonged detention of children at YSC flies in the face of the juvenile system's mandate to achieve its goals "in the least restrictive settings necessary."   D.C. Code § 16-2301.02(9).  Further, children awaiting medium- or low-level placements are, by definition, not in need of *any* secure placement, let alone the jail-like setting of YSC.

63.     Extending the time that children are in secure detention is harmful to their well-being and growth.

64.     The negative effects of secure detention on youth are well-documented.  A report from the Justice Policy Institute found that incarcerating youth can "facilitate increased crime by aggravating the recidivism of youth who are detained," "pull[] youth deeper into the juvenile and criminal justice system," "slow or interrupt the natural process of 'aging out of delinquency,'" "make[] mentally ill youth worse," and "put[] youth at greater risk of self-harm."[26]  Incarceration during adolescence also leads to poorer health in adulthood.[27]  Placing a child in secure detention, where they are cut off from their community ties, their community-based school, and other

---

[26] Barry Holman & Jason Ziedenberg, *The Dangers of Detention:  The Impact of Incarcerating Youth in Detention and Other Secure Facilities*, at 4–6, 8–9, Justice Policy Institute, https://justicepolicy.org/wp-content/uploads/2022/02/06-11_rep_dangersofdetention_jj.pdf.

[27] Richard Mendel, *Why Youth Incarceration Fails: An Updated Review of the Evidence*, The Sentencing Project (Mar. 1, 2023).

conventional opportunities for growth, "hinders the juvenile's developmental process, leads to depression, and increases the risk of suicide or other self-harm."[28]

65.    This and similar research undergirded the D.C. Council's decision to limit the use of pre-disposition detention on youth.[29]  Indeed, D.C. law is emphatic that detention is a last-resort in the juvenile delinquency system, which prioritizes keeping children "out of a jail-like setting," *In re K.G.*, 178 A.3d at 1217, and in the "least restrictive settings necessary," D.C. Code § 16-2301.02(9).

66.    Yet DYRS—the agency responsible for the care and rehabilitation of children in need of services committed to its custody—is effectively *extending* the time children must remain in secure detention, at great cost to their development and well-being.

## V.    Plaintiffs' Experiences Illustrate the Harm Caused by DYRS's Failures.

67.    For each of the named Plaintiffs, DYRS has—for months now—failed to send them to placements that can provide children the treatment that DYRS has itself determined is necessary and which is the entire purpose of their detention.

68.    Moreover, DYRS has failed to conduct assessments or develop individualized treatment plans in accordance with the mandatory timelines set forth in D.C. Code § 16-2319.

69.    Instead, the District has held Plaintiffs at YSC while they await placement: Plaintiff K.Y. has been held at YSC in awaiting placement status since July 29, 2024, and Plaintiff D.J. has been awaiting placement at YSC since September 4, 2024.

---

[28] Office of Juvenile Justice and Delinquency Prevention, Literature Review: Alternatives to Detention and Confinement (August 2014).
[29] *See* Committee on the Judiciary, *Report on Bill 21-0683, the "Comprehensive Youth Justice Amendment Act of 2016"* at 9 (Oct. 5, 2016), https://lims.dccouncil.gov/downloads/LIMS/35539/Committee_Report/B21-0683-CommitteeReport1.pdf?Id=61801.

70.     YSC is entirely unequipped to provide the rehabilitative services that Plaintiffs need.  Plaintiffs K.Y. and D.J. were recommended for high-level placements where they can receive rehabilitative services and care, and neither K.Y. nor D.J. are receiving this type of treatment at YSC.

71.     K.Y., for example, is waiting to be sent to a psychiatric residential treatment facility where he can receive individualized therapy, but instead he has been confined at YSC where he is not receiving such a service.

72.     Plaintiffs and putative class members face compounding harm every day that they spend at YSC awaiting placement.  Plaintiff D.J. states that it "feels depressing because you're just here for no reason . . . like [DYRS is] taking their time."  K.Y., who "ha[s] trouble sleeping at night because of [his] PTSD," has needs such that DYRS has informed him that he will be required to "go to a PRTF" so he can "get therapy," but has instead been waiting at YSC for nearly three months after commitment—he "just want[s] to leave to start [his] program."

## CLASS ACTION ALLEGATIONS

73.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs bring the claims in this action on behalf of a class consisting of all youth who are or will be committed to DYRS custody and detained at YSC awaiting placement.

74.     Plaintiffs reserve the right to amend the class definition or establish sub-classes as appropriate if discovery or further investigation reveals the class should be expanded or otherwise modified.

75.     The class is so numerous that joinder is impracticable.  As of this filing, 22 children are at YSC awaiting placement by DYRS; throughout the course of a single year, dozens more are in this situation.

76. Joinder is also inherently impracticable because the number of unnamed, future class members is unknown and will continue to rise as children are committed to DYRS custody.

77. Joinder is also impracticable because putative class members are highly unlikely to file individual suits on their own behalf given the practical barriers, including their status as minors and their own indigency, that prevent their ability to file suit.

78. The claims of the class share common questions of law and fact, including but not limited to whether Defendants have violated their duty to provide rehabilitative care and treatment to children in its custody who are awaiting placement; whether Defendants' excessive delays in assessing and developing individualized treatment plans for children violates deadlines set by the D.C. Code; and whether Defendants violate the constitutional rights of the children in its custody by extending the length of their detention in secure jail-like settings and failing to provide rehabilitative services.

79. The claims of Plaintiffs are typical of those of the class as a whole because Plaintiffs are currently awaiting placement at YSC while in Defendants' custody and are subject to the same practices as the putative class members.

80. Plaintiffs are adequate class representatives who meet all of the requirements of Rule 23(a)(4). They have no conflicts of interest in this case with other putative class members. They will fairly and adequately represent the interests of the class and understand the responsibilities of a representative. Counsel for Plaintiffs are attorneys with extensive experience with the factual and legal issues involved in representing individuals detained in adult and youth facilities and/or in litigating class actions and complex federal cases asserting constitutional violations. Counsel will vigorously pursue the interests of the class.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**DUE PROCESS, U.S. Const. Amend. V, via 42 U.S.C. § 1983**
(unreasonable delay of rehabilitative treatment amounts to punishment, substantial departure
from professional judgment, and detention not reasonably related to purpose of commitment)

81.     The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The protections of due process govern the circumstances, conditions, and duration of confinement for children who have been committed to DYRS custody because "a juvenile adjudication is not the equivalent of a criminal conviction."  *McAdoo v. United States*, 515 A.2d 412, 418 (D.C. 1986).

82.     In the noncriminal context, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which an individual is committed. Additionally, due process protects people who have not been convicted of a crime from being punished.  Due process also protects people who are detained under civil process, such as Plaintiffs, from being subjected to conditions that are such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

83.     The purpose for which Plaintiffs and putative class members are committed to DYRS custody is rehabilitation, as the District's juvenile justice system is premised on "the rehabilitation of children," "promot[ing] youth development," and "hold[ing] the government accountable for the provision of reasonable rehabilitative services."  D.C. Code §§ 16-2301.02(5), (2), (7).

84.     DYRS violates Plaintiffs' and putative class members' due process rights to rehabilitative services and treatment by failing to timely place them in the appropriate low-, medium-, and high-level placements that can meet their identified rehabilitative needs, and instead

22

keeping them at YSC—a jail-like facility that is crowded, dangerous, and does not and cannot provide for children's rehabilitative needs. Prolonged detention at YSC is not reasonably related to the purpose of commitment, which is rehabilitation.

85.    DYRS's practice of holding Plaintiffs and putative class members in YSC for unnecessarily long periods prior to placement in rehabilitative settings is unreasonable so as to amount to punishment.

86.    DYRS's practice of holding children at YSC for prolonged periods also substantially departs from professional judgment because these extended detentions serve no purpose, arise in part because the agency has ignored statutory mandates regarding timely assessments and treatment plans, contravene the agency's own determination about the appropriate setting for these children, and flout the juvenile system's goal of keeping children in the "least restrictive settings necessary." D.C. Code § 16-2301.02(9).

87.    The District is liable under 42 U.S.C. § 1983 because it is the moving force behind the constitutional violation, in two independent ways:

a.    DYRS's practice of extensively delaying placements for children in its custody so as to detain the children in a jail-like setting, incompatible with the purpose for which they are committed, is so pervasive as to constitute a custom, i.e., a widespread practice that, although not authorized by written law or express municipal policy, is permanent and well settled.

b.    The District has failed to supervise and train DYRS employees to take measures (such as, for instance, conducting timely assessments and timely devising individualized treatment plans) to ensure children committed to DYRS are not held needlessly at YSC without rehabilitative care and treatment, under circumstances

in which the need for training and supervision is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the District has been deliberately indifferent to the need.

88.    As a result of Defendants' actions, Plaintiffs and putative class members are experiencing irreparable harm.  On an ongoing basis, the extended detention in YSC that Plaintiffs and putative class members are experiencing harms their mental, emotional, and physical well-being, deprives them of their liberty by subjecting them to more restrictive settings than necessary, denies them rehabilitative services to which they are entitled, and hinders the developmental process.

### SECOND CLAIM FOR RELIEF
### DUE PROCESS, U.S. Const. Amend. V, via 42 U.S.C. § 1983
(extension of duration of secure detention amounts to punishment and is not reasonably related to purpose of commitment)

89.    The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The protections of due process govern the circumstances, conditions, and duration of confinement for children who have been committed to DYRS custody, because "a juvenile adjudication is not the equivalent of a criminal conviction."  *McAdoo v. United States*, 515 A.2d 412, 418 (D.C. 1986).

90.    In the noncriminal context, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which an individual is committed. Additionally, due process protects people who have not been convicted of a crime from being punished.

91.    By unreasonably delaying when Plaintiffs and putative class members are transferred to their initial placements, DYRS extends the overall amount of time Plaintiffs and putative class members spend in secure detention, because they cannot begin accruing credit

toward their release into less restrictive placements unless they begin their rehabilitative work at their initial placement.

92.    The added time Plaintiffs and putative class members spend in secure detention bears no relation to the purpose of commitment, which is rehabilitation.

93.    Further, requiring Plaintiffs and putative class members to spend additional time in secure detention for no reason is unreasonable and thus amounts to prohibited punishment of people who have not been convicted of a crime.

94.    The District is liable under 42 U.S.C. § 1983 because it is the moving force behind the constitutional violation, in two independent ways:

a.    DYRS's practice of extensively delaying placements for children in its custody so as to detain the children in a jail-like setting, incompatible with the purpose for which they are committed, is so pervasive as to constitute a custom, i.e., a widespread practice that, although not authorized by written law or express municipal policy, is permanent and well settled.

b.    The District has failed to supervise and train DYRS employees to take measures (such as, for instance, conducting timely assessments and timely devising individualized treatment plans) to ensure children committed to DYRS are not held needlessly at YSC without rehabilitative care and treatment, under circumstances in which the need for training and supervision is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the District has been deliberately indifferent to the need.

95.    As a result of Defendants' actions, Plaintiffs and putative class members are experiencing irreparable harm. On an ongoing basis, the extended detention in YSC that Plaintiffs

and putative class members are experiencing harms their mental, emotional, and physical well-being, deprives them of their liberty by subjecting them to more restrictive settings than necessary, denies them rehabilitative services to which they are entitled, and hinders the developmental process.

**THIRD CLAIM FOR RELIEF**
**DUE PROCESS, U.S. Const. Amend. V, via inherent equitable power**
(unreasonable delay of rehabilitative treatment amounts to punishment, substantial departure from professional judgment, and detention not reasonably related to purpose of commitment)

96.     The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The protections of due process govern the circumstances, conditions, and duration of confinement for children who have been committed to DYRS custody, because "a juvenile adjudication is not the equivalent of a criminal conviction." *McAdoo v. United States*, 515 A.2d 412, 418 (D.C. 1986).

97.     In the noncriminal context, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which an individual is committed. Additionally, due process protects people who have not been convicted of a crime from being punished. Due process also protects people who are detained under civil process, such as Plaintiffs, from being subjected to conditions that are such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

98.     The purpose for which Plaintiffs and putative class members are committed to DYRS custody is rehabilitation, as the juvenile system is premised on "the rehabilitation of children," "promot[ing] youth development," and "hold[ing] the government accountable for the provision of reasonable rehabilitative services." D.C. Code §§ 16-2301.02(5), (2), (7).

99.     DYRS violates Plaintiffs' and putative class members' due process rights by failing to timely place them in the appropriate low-, medium-, and high-level placements that can meet their identified rehabilitative needs, and instead keeping them at YSC—a jail-like facility that is crowded, dangerous, and does not and cannot provide for children's rehabilitative needs. Prolonged detention at YSC is not reasonably related to the purpose of commitment, which is rehabilitation.

100.    DYRS's practice of holding Plaintiffs and class members in YSC for unnecessarily long periods prior to placement in rehabilitative settings is unreasonable so as to amount to punishment.

101.    DYRS's practice of holding also substantially departs from professional judgment, because these extended detentions serve no purpose, arise in part because the agency has ignored statutory mandates regarding timely assessments and treatment plans, contravene the agency's own determination about the appropriate setting for these children, and flout the juvenile system's goal of keeping children in the "least restrictive settings necessary."  D.C. Code § 16-2301.02(9).

102.    The District's violation of Plaintiffs' and class members' due process rights, carried out under color of law, may be enjoined under this Court's equitable power.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

103.    As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm.  On an ongoing basis, the extended detention in YSC that Plaintiffs and class members are experiencing harms their mental, emotional, and physical well-being, deprives them of their liberty by subjecting them to more restrictive settings than necessary, denies them rehabilitative services to which they are entitled, and hinders the developmental process.

**FOURTH CLAIM FOR RELIEF**
**DUE PROCESS, U.S. Const. Amend. V, via inherent equitable power**
(extension of duration of secure detention amounts to punishment and is not reasonably related to purpose of commitment)

104.    The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The protections of due process govern the circumstances, conditions, and duration of confinement for children who have been committed to DYRS custody, because "a juvenile adjudication is not the equivalent of a criminal conviction." *McAdoo v. United States*, 515 A.2d 412, 418 (D.C. 1986).

105.    In the noncriminal context, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which an individual is committed. Additionally, due process protects people who have not been convicted of a crime from being punished.

106.    By unreasonably delaying when Plaintiffs and putative class members are transferred to their initial placements, DYRS extends the overall amount of time Plaintiffs and putative class members spend in secure detention, because they cannot begin accruing credit toward their release into less restrictive placements unless they begin their rehabilitative work at their initial placement.

107.    The added time Plaintiffs and putative class members spend in secure detention bears no relation to the purpose of commitment, which is rehabilitation.

108.    Further, requiring Plaintiffs and putative class members to spend additional time in secure detention for no reason is by definition unreasonable and thus amounts to prohibited punishment of people who have not been convicted of a crime.

109.    The District's violation of Plaintiffs' and putative class members' due process rights, carried out under color of law, may be enjoined under this Court's equitable power.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

110.    As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm.  On an ongoing basis, the extended detention in YSC that Plaintiffs and class members are experiencing harms their mental, emotional, and physical well-being, deprives them of their liberty by subjecting them to more restrictive settings than necessary, denies them rehabilitative services to which they are entitled, and hinders the developmental process.

### FIFTH CLAIM FOR RELIEF
### NEGLIGENCE

111.    DYRS is responsible for the care of all children committed to its custody following disposition.  *See* D.C. Code § 16-2320(c)(2) (noting that commitment involves the "[t]ransfer of legal custody" to DYRS); D.C. Code § 16-2301(21) (noting that "legal custody" means the vesting of "the responsibility for the custody of a minor").

112.    Beyond meeting the basic needs of children in DYRS custody, D.C. Code § 2-1515.01(5)(A), DYRS is responsible for ensuring that children committed to their custody receive treatment and rehabilitative services, in line with the system's emphasis on rehabilitation over punishment.

113.    Indeed, DYRS is tasked by law with "lead[ing] the reform of the District's juvenile justice system" by "[i]mprov[ing] the . . . rehabilitation services provided to committed and detained juvenile offenders," "[d]evelop[ing] and maintain[ing] a holistic, family-oriented approach to the provision of youth services."  D.C. Code § 2-1515.02(a).

114.    DYRS must also "place a premium on the rehabilitation of children" within a system that "treat[s] children as children in all phases of their involvement."  D.C. Code § 16-

2301.02.  It is required by law to "plan, program, operate, manage, control, and maintain a juvenile justice system of care, rehabilitative service delivery, and security that meets the treatment needs of youth" in its custody, including "[p]roviding services for committed and detained youth . . . that balance the need for rehabilitation" with accountability, and "[e]stablishing and adopting best practices standards for the provision of residential, restorative, and rehabilitative services."  D.C. Code § 2-1515.04.

115.    DYRS systematically breaches these duties owed to children in their custody who are awaiting placement.  DYRS does so by holding them at YSC where they do not receive any of the rehabilitative programming or treatment that the Family Court deemed necessary, and by failing to ensure that children committed to DYRS custody are timely placed at an appropriate facility that can meet their needs.

116.    As a result of Defendants' actions, Plaintiffs and class members are experiencing irreparable harm.  On an ongoing basis, the extended detention in YSC that Plaintiffs and class members are experiencing harms their mental, emotional, and physical well-being, deprives them of their liberty by subjecting them to more restrictive settings than necessary, denies them rehabilitative services to which they are entitled, and hinders the developmental process.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF D.C. CODE § 16-2319, via inherent equitable power**

117.    Once a child is "adjudicated delinquent and a dispositional order has been entered," DYRS is required to "conduct an evaluation of the child to determine the appropriate services and to develop an individualized treatment plan for the child."  D.C. Code § 16-2319(d).

118.    D.C. Code § 16-2319(f) requires DYRS to adhere to a strict timeline in developing these treatment plans for children committed to its custody and care.

119.    The law provides that DYRS "shall complete an initial assessment of the child within 3 days of taking legal custody of the child and receipt of the social file from the Director of Court Social Services." D.C. Code § 16-2319(f). DYRS then "shall develop the individualized treatment plan within 14 days of completing the initial assessment of the child." *Id.* A longer timeline is only permissible when "a longer diagnostic phase is needed," but extending the timeline under this exception must be "justified in writing in the child's initial assessment." *Id.* Any extensions of the timelines in this provision must be requested and done "for good cause shown." D.C. Code § 16-2319(g).

120.    DYRS fails to abide by these requirements.

121.    DYRS exceeds these deadlines by weeks, and more often months, in nearly all, if not all, cases of a child committed to DYRS custody. Further, despite regularly missing these deadlines, DYRS never "justifie[s] in writing" these delays or moves for extensions, and sometimes does not do the assessment or individualized treatment plan at all.

122.    Defendants' violation of D.C. statutory mandates is redressable by injunctive relief: Under D.C. law, "[t]he actions of government agencies are normally presumed to be subject to judicial review unless [the legislature] has precluded review or a court would have no law to apply to test the legality of the agency's actions." *District of Columbia v. Sierra Club*, 670 A.2d 354, 358 (D.C. 1996).

123.    The failure to meet the deadlines prescribed by D.C. law causes confusion and anxiety on an ongoing basis among the Plaintiffs and class members held at YSC, and also leads to extended detention at YSC.

124.    In turn and on an ongoing basis, the extended detention in YSC that Plaintiffs and putative class members are experiencing harms their mental, emotional, and physical well-being,

deprives them of their liberty by subjecting them to more restrictive settings than necessary, denies them rehabilitative services to which they are entitled, and hinders the developmental process.

**SEVENTH CLAIM FOR RELIEF**
**NEGLIGENCE PER SE / VIOLATION OF D.C. CODE § 16-2319**

125.    Once a child is "adjudicated delinquent and a dispositional order has been entered," DYRS is required to "conduct an evaluation of the child to determine the appropriate services and to develop an individualized treatment plan for the child." D.C. Code § 16-2319(d).

126.    D.C. Code § 16-2319(f) requires DYRS to adhere to a strict timeline in developing these treatment plans for children committed to its custody and care.

127.    The law provides that DYRS "shall complete an initial assessment of the child within 3 days of taking legal custody of the child and receipt of the social file from the Director of Court Social Services." D.C. Code § 16-2319(f). DYRS then "shall develop the individualized treatment plan within 14 days of completing the initial assessment of the child." *Id.* A longer timeline is only permissible when "a longer diagnostic phase is needed," but extending the timeline under this exception must be "justified in writing in the child's initial assessment." *Id.* Any extensions of the timelines in this provision must be requested and done "for good cause shown." D.C. Code § 16-2319(g).

128.    DYRS fails to abide by these requirements.

129.    DYRS exceeds these deadlines by weeks, and more often months, in nearly all, if not all, cases of children committed to DYRS custody. Further, despite regularly missing these deadlines, DYRS never "justifie[s] in writing" these delays or moves for extensions, and sometimes does not do the assessment or individualized treatment plan at all.

130.    The time limits of D.C. Code § 16-2319 exists to promote the safety of the children remanded to the custody of DYRS by ensuring they are receiving appropriate treatment. For the

same reason, it is intended to benefit these children. And in mandatory terms, it imposes specific duties on the "Youth Services Administration"—the predecessor agency of DYRS.

131.    Defendants are accordingly negligent per se because they breached the statutory duty of care owed to Plaintiffs and the putative class members.

132.    The failure to meet the deadlines prescribed by D.C. law causes confusion and anxiety on an ongoing basis among the Plaintiffs and putative class members held at YSC and also leads to extended detention at YSC.

133.    In turn and on an ongoing basis, the extended detention in YSC that Plaintiffs and putative class members are experiencing harms their mental, emotional, and physical well-being, deprives them of their liberty by subjecting them to more restrictive settings than necessary, denies them rehabilitative services to which they are entitled, and hinders the developmental process.

**RELIEF REQUESTED**

Wherefore, Plaintiffs and putative class members respectfully request that the Court:

A. Certify the putative class under Federal Rule of Civil Procedure 23(b)(2) and appoint the named Plaintiffs as class representatives and the undersigned counsel as class counsel;

B. Declare that Defendants' failure to timely place children in appropriate placements and the resulting extension of the time Plaintiffs and the putative class are held in secure detention is unlawful;

C. Enter injunctive relief in Plaintiffs' favor mandating that Defendants:

   a. Abide by the timeline for initial assessments and individualized treatment plans set out in D.C. Code § 16-2319;

33

b.  Ensure that children receive the rehabilitative programming and treatment that the Family Court deems necessary at disposition by providing prompt placement outside YSC; and

c.  In all delinquency cases in Family Court, provide the Family Court, prior to the dispositional hearing, with a plan for placement and inform the Family Court of any anticipated delays to placement.

D.  Appoint an independent monitor with expertise in the juvenile delinquency system to ensure compliance with these conditions and provide the monitor with unfettered access to DYRS's internal processes and communications regarding children's placement.

E.  Award such further relief as the Court deems appropriate.

Dated:  October 28, 2024                          Respectfully submitted,

/s/ Megan Yan
Megan Yan, D.C. Bar No. 1735334
Hanna Perry, D.C. Bar No. 90003756
Maya Chaudhuri, D.C. Bar No. 1779875

PUBLIC DEFENDER SERVICE FOR THE
DISTRICT OF COLUMBIA
633 3rd Street N.W.
Washington D.C. 20001
(202)-824-2201
myan@pdsdc.org
hperry@pdsdc.org
mchaudhuri@pdsdc.org

Scott Michelman, D.C. Bar No. 1006945
Aditi Shah*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722

---

* Application for admission pro hac vice forthcoming; application for admission to the D.C. bar forthcoming; practice limited to federal courts.

Washington, D.C. 20045
(202) 457-0800
smichelman@acludc.org
ashah@acludc.org

*Counsel for Plaintiffs**

---

**Counsel wish to acknowledge the assistance of paralegal Ameerah Adetoro in the preparation of this complaint.