UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

K.Y., *et al.*,

    *Plaintiffs*,

v.

DISTRICT OF COLUMBIA, *et al.*,

    *Defendants*.

Civil Action No. 1:24-cv-03056 (CJN)

**MEMORANDUM OPINION**

    K.Y. and D.J., two minors who were committed to the custody of the D.C. Department of Youth Rehabilitation Services after being adjudicated delinquent, challenge their extended detention in a secure facility called the Youth Services Center while awaiting a rehabilitation placement. ECF 1. At issue here, K.Y. and D.J. move to certify a class of all "[y]outh who are currently or will be (1) committed to the custody of the D.C. Department of Youth Rehabilitation Services; (2) detained at the Youth Services Center; and (3) awaiting placement." ECF 2 at 1. For the reasons that follow, the Court denies their motion.

**I.    Background**

    Starting in the late summer of 2024, K.Y. and D.J. spent several months in the Youth Services Center while the D.C. Department of Youth Rehabilitation Services worked to match them with a long-term rehabilitation provider. *See* ECF 1 at 4. According to K.Y. and D.J., the Department's placement process has broken down, leaving many other children like them similarly languishing at the Center for months. *Id.* at 3. They contend that extended stays at the Center are contrary to the Department's rehabilitative goals given that this "jail-like facility . . . is crowded, violent, and harmful to children at a critical time in their development." *Id.*

1

In late 2024, K.Y. and D.J. sued the District of Columbia and Sam Abed, the Director of the Department. *Id.* at 1. They argue that their extended detention at the Center violated the Fifth Amendment's Due Process Clause and several provisions of District law, and they also bring claims premised on theories of negligence and negligence per se. *Id.* at 22–33. K.Y. and D.J. concurrently moved to certify a class made up of all those who are currently held or will be held at the Center while awaiting placement. ECF 2 at 1. And a few days after filing that motion, they moved for a preliminary injunction that would require the District to place all children committed to Department custody in a timely manner. ECF 7 at 1.

The Court held a hearing on the motion for a preliminary injunction in December 2024. *See* Min. Entry of Dec. 12, 2024. Within a few days of that hearing, the Department successfully placed K.Y. and D.J. at rehabilitative facilities. *See* ECF 25 at 1. K.Y. and D.J. accordingly requested that the Court hold their motion for a preliminary injunction in abeyance pending briefing on whether to certify a class. *Id.* at 1–2. The Court granted that request. *See* Min. Order of Dec. 17, 2024.

During the same time frame, the D.C. Council took action to address some of K.Y. and D.J.'s concerns. When this suit began, D.C. law required the Department to "complete an initial assessment of the child within 3 days of taking legal custody of the child and receipt of the social file from the Director of Court Social Services" and "develop the individualized treatment plan within 14 days of completing the initial assessment of the child, unless a longer diagnostic phase is needed for the child and is justified in writing in the child's initial assessment." Omnibus Juvenile Justice Act of 2004, § 902, 2004 D.C. Laws 15-261 (codified as amended at D.C. Code § 16-2319(f)). In December 2024, however, the D.C. Council passed the Recidivism Reduction at DYRS Amendment Act of 2024 (ROAD Act), which amended some of these rules. *See* ECF

2

28 at 3. Under the ROAD Act, the Department now shall, "[w]ithin 10 days" "[f]ollowing Court Social Services's or the Office of the Attorney General's notice to the Division of its recommendation to commit a child to the Department," "perform a validated risk and needs assessment" of that child. D.C. Code § 16-2319(d). The Act also directs the Department to "[c]onvene a predisposition meeting to review the validated risk and needs assessment and any information on the child that the Department deems necessary, including evaluations, to begin the development of an individualized rehabilitation plan for the child" that is completed "[n]o later than 2 days . . . before the dispositional hearing." *Id.*

Through a series of subsequent filings, the Parties contested the ROAD Act's relevance to this case and its effect on the speed of placements. K.Y. and D.J. argue that the Act's "changes to statutory deadlines for initial assessments and individualized treatment plans do not address [the Department]'s systemic failures in securing placements." ECF 34 at 1–2. Moreover, although K.Y. and D.J. concede that the Act became effective in March 2025, they contend that it "has not and cannot be implemented unless and until the underlying costs are funded through the District's appropriations process." *Id.* The Act states that the relevant portions "shall apply upon the date of inclusion of their fiscal effect in an approved budget and financial plan," Recidivism Reduction at DYRS Amendment Act of 2024, § 7(a), 2024 D.C. Laws 25-321, but it is not clear that sufficient appropriations have been made yet, *see* ECF 34 at 2; ECF 35-1 at 4. The District responds that the ROAD Act's enactment counsels against "judicial intervention" given that it shows that "policymakers in the executive and legislative branches of District government" are working to address K.Y. and D.J.'s concerns. ECF 33 at 2. And it argues that the changes made by the ROAD Act show that K.Y. and D.J. "misstated the requirements of District law." *Id.*

3

In the interim, even with enactment of the ROAD Act (albeit potentially without complete funding), the issue of lengthy pre-placement commitments at the Center has persisted. The number of minors held at the Center awaiting placement has remained relatively constant, if not trended up slightly, since the beginning of this litigation. The relevant population dropped in the spring of 2025 and rose a little bit in the late fall of 2025, but it has remained between 20 and 30 minors during most months this litigation has been pending. Similarly, the average time spent at the Center by such minors has remained relatively stable since peaking in late July 2025, with the average length of stay largely oscillating between 75 and 100 days. The charts below illustrate these changes (and lack thereof) over time.



4

Office of Independent Juvenile Justice Facilities Oversight, *DYRS Secure Facilities Population Data Over Time*, https://oijjfo.dc.gov/page/dyrs-secure-facilities-population-data-over-time (last visited Jan. 16, 2026); *see also* ECF 35-1 at 2 & n.5; ECF 37 at 2–3.

## II.     Analysis

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). Federal Rule of Civil Procedure 23(a) limits the availability of class actions by dictating four prerequisites for class certification. *See* Fed. R. Civ. P. 23(a). In particular, a party seeking to form a class must establish that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Id.* "Failure to adequately demonstrate any of the four [requirements] is fatal to class certification." *Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* Accordingly, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

The "crux" here, as in many cases, is "commonality—the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.'" *Id.* at 349 (quoting Fed. R. Civ.

P. 23(a)(2)). In particular, "Rule 23(a)(2) is satisfied if *resolution of each plaintiff's claim* turns on a common *question* (or questions) and if common *proof* leads to a common *answer* (or answers) to that question for each plaintiff." *Brown v. District of Columbia*, 928 F.3d 1070, 1081 (D.C. Cir. 2019). K.Y. and D.J. must therefore establish that their claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

In their initial brief, K.Y. and D.J. contended that they "satisf[y] the commonality requirement because Defendants maintain a 'system-wide policy or practice' of not conducting assessments or developing individualized treatment plans of children in a timely manner, and of holding children in a jail-like setting for months on end without purpose." ECF 2-1 at 12. They provided three examples of questions common to their proposed class: "(1) Whether Defendants have, by excessively delaying placements, violated their duty to provide rehabilitative care and treatment to children in [their] custody who are awaiting placement; (2) Whether Defendants' excessive delays in assessing and developing plans for children in their custody violate [the Department]'s statutory command; and (3) Whether Defendants violate the constitutional rights of the children in [their] custody by extending the length of their detention in secure jail-like settings and failing to provide rehabilitative services." *Id.* And they argued that "[e]ach of these questions can be resolved as to the class as a whole . . . because they turn on Defendants' policies and practices affecting every single class member." *Id.* at 13.

The District responds that K.Y. and D.J. improperly view commonality at a "sky-high level of generality." ECF 28 at 13. It contends that "there is no 'uniform policy or practice' that accounts for the amount of time it takes to place all youth in [Department] custody held at [the

6

Center]" because "[t]he length of time spent awaiting placement depends on various factors, including" (1) the type of placement needed, (2) the information required by a placement facility, (3) the location of a placement facility, (4) the individual circumstances of the minor, and (5) the availability of spots at a placement facility. *Id.* at 1, 3, 15 (citation omitted). And it argues that because the questions of "what constitutes an excessive delay" and "whether there is any common cause for such alleged delays" are "highly individualized," "it is simply not possible for the Court to answer Plaintiffs' questions in a way that would resolve all of the putative class members' claims with 'one stroke.'" *Id.* at 17 (emphasis omitted) (quoting *Wal-Mart*, 564 U.S. at 350).

"Rule 23 does not allow for [the] 30,000 foot view of commonality" proposed by K.Y. and D.J. in their motion and opening brief. *In re White*, 64 F.4th 302, 314 (D.C. Cir. 2023). Where "the plaintiffs' claims appear to be based on multiple, disparate failures to comply with the District's statutory . . . obligations rather than a truly systemic policy or practice which affects them all," there is not sufficient commonality to certify a class. *DL v. District of Columbia*, 713 F.3d 120, 127–28 (D.C. Cir. 2013) (alterations adopted) (citation and internal quotation marks omitted); *see also Lightfoot v. District of Columbia*, 273 F.R.D. 314, 329 (D.D.C. 2011) ("Plaintiffs, for their part, fail to show that the class members share a common injury from the same 'policy or custom,' and instead rely on the mistaken assumption that it suffices to say that a large number of class members appear to have suffered some deprivation of due process as a result of a wide-ranging and poorly defined set of practices and polic[i]es."). K.Y. and D.J.'s allegations that the Department systematically fails to timely conduct assessments and develop individualized treatment plans for minors in its care at the Center—without any specific explanations of how the same policy failures cause these delays for all of the proposed class members—are far too general to ensure that "determination of [the] truth or falsity" of the allegedly common questions "will

7

resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Perhaps recognizing this commonality problem in their initial framing, K.Y. and D.J.'s reply brief reframes their argument to focus on two specific alleged deficiencies: the Department's "failure to timely (1) gather records it deems necessary to make placement decisions; and (2) convene its Placement Review Committee . . . to determine appropriate placements and submit applications to placements." ECF 31 at 2. They contend that the Department's "uniform practice" of untimely placements "stems largely from" this "uniform set of reasons," which "appl[y] to all class members regardless of their personal circumstances." *Id.* at 13–14. And they argue that these failures "do not reflect K.Y. and D.J.'s personal circumstances, and are instead evidence of a uniform practice of delaying placements across class members." *Id.* at 14.

But, even with this new focus, K.Y. and D.J. have not established commonality. The Court of Appeals has explained that it can be "'productive' and 'economical' to consider the class's claims together" where "[n]ot only do all class members present the same challenge to the policy, but there also is no evident variation among them concerning their ultimate entitlement to relief: if any person in the class has a meritorious claim, they all do." *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019) (alteration adopted) (quoting *Wal-Mart*, 564 U.S. at 349 n.5). Here, however, it is far from evident that "determination of [the] truth or falsity" of the "contention" that the Department was untimely in gathering records and convening the Placement Review Committee for class members "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Whether the Department's conduct in overseeing the commitment of a particular minor was unlawful largely hinges on individual context and circumstances—even if there is some overlap in the sources that contributed, at least in part, to

8

extended placement delays across multiple minors. Indeed, because even the cause, length, and impact of alleged delays in gathering records and convening the Placement Review Committee almost certainly vary with each potential class member, questions common to the proposed class that would actually facilitate resolution of their claims are not readily apparent.

Examining the nature of the claims at issue further illustrates why there is "no cause to believe that all their claims can productively be litigated at once."[1] *Id.* K.Y. and D.J. assert three categories of claims: (1) violations of due process under the Fifth Amendment, (2) negligence, and (3) violations of D.C. Code § 16-2319. *See* ECF 1 at 22–33. These claims, however, are ill-suited for classwide resolution because they are likely to turn on the individualized circumstances of each minor.

The due process claims present the most obvious challenge for K.Y. and D.J.'s ability to establish that "*resolution of each plaintiff's claim* turns on a common *question* (or questions) and [that] common *proof* leads to a common *answer* (or answers) to that question for each plaintiff." *Brown*, 928 F.3d at 1081. As courts in this District have recognized, "due process claims may be difficult to resolve through classwide proceedings." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 203 (D.D.C. 2020); *see also Lightfoot*, 273 F.R.D. at 328 (explaining that an "amorphous due process claim, which turns on [a] flexible, multi-factor balancing test . . . is not as easily susceptible to class-wide treatment"). Such concerns are present here in light of K.Y. and D.J.'s argument that the Court should engage in a "balancing" of interests "informed by three different, interrelated standards from the Supreme Court: those of *Jackson v. Indiana*, 406 U.S. 715 (1972); *Youngberg*

---

[1] The Court considers questions about the merits—or more precisely here, the legal standards that would govern the merits inquiry—"only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

9

[*v. Romeo*, 457 U.S. 307 (1982)]; and *Bell v. Wolfish*, 441 U.S. 520 (1979)." ECF 7-1 at 17–18. As even K.Y. and D.J.'s own merits briefing demonstrates, this balancing depends on the circumstances of each individual minor, including the length of commitment and the minor's medical needs. *See, e.g.*, *id.* at 20 (emphasizing that "the need for [rehabilitative] services grows even stronger" the longer a youth is committed when discussing the *Jackson* standard); *id.* at 23–24 (citing the Department's failure to provide K.Y. necessary therapy services as a relevant consideration when evaluating the District's interest under *Bell*). And without taking a definitive stance on the exact contours of the due process standard that would apply in this case, it is easy to imagine that other individualized factors such as the minor's age, the types of rehabilitative services provided while at the Center, and the existence of external factors preventing a minor's placement would affect the outcome of each putative class member's due process claims.

K.Y and D.J.'s negligence claims, like their due process claims, are not well-suited for classwide resolution because they would likely turn on individualized assessments of whether the Department breached a duty to a particular minor at a certain point in time during commitment at the Center. *Cf. Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979) ("The law of negligence . . . requires an adherence to a uniform standard of conduct: that of reasonable care *under the circumstances*." (emphasis added)); *Sinai v. Polinger Co.*, 498 A.2d 520, 531 (D.C. 1985) ("[T]he amount of care owed a plaintiff by a particular defendant is 'a relative concept' that changes 'according to circumstances.'"). For the statutory (and by extension, negligence per se) claims, K.Y. and D.J. have not established that the class members would have "common answer[s] to the common question[s]" regarding alleged violations of statutory deadlines. *Brown*, 928 F.3d at 1080

(emphases omitted).  As the District points out,[2] even K.Y. and D.J. themselves potentially lack common answers regarding alleged violations of the deadlines laid out in D.C. Code § 16-2319 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬,[3] ▬▬▬▬▬

   K.Y. and D.J.'s attempted reframing of the common questions in this case also magnifies typicality problems with their proposed class. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ They do not, however, present evidence that these two alleged failures are also the uniform cause of delay in other potential class members' placements.  Without any showing that other class members are also subject to this "unitary course of conduct," "a distinction [that] differentiate[s] the claims or defenses of the representatives from those of the class" exists.  *J.D.*, 925 F.3d at 1322 (emphasis omitted) (citations and internal quotation marks omitted).  K.Y. and D.J.'s attempt to define the proposed class so broadly as to include all "[y]outh who are currently or will be (1) committed to the custody of the D.C. Department of Youth Rehabilitation Services; (2) detained at the Youth Services Center; and (3) awaiting placement" compounds this typicality problem.  ECF 2 at 1.  Not only does nothing

---

[2] The District makes this argument in the context of typicality, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ but as is often the case, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157 n.13.

[3] The ROAD Act's intervening enactment further complicates commonality for the statutory claims because the applicable deadlines have changed.  *See* ECF 31 at 6 (acknowledging that "[t]hese would-be amendments change the timelines in D.C. Code § 16-2319(f)"); ECF 35-1 at 4 (conceding that "[t]he legislation became effective March 28, 2025").  K.Y. and D.J.'s proposed class of all "[y]outh who are currently or will be" committed at the Center therefore appears to combine the claims of minors subject to different, not common, statutory deadlines.  ECF 2 at 1.

11

in that proposed class definition limit the class to only those minors whose placements were delayed due the Department's alleged failure to timely gather records and convene the Placement Review Committee, but that definition also covers any minor committed at the Center for any amount of time—even those placed in a quick manner.[4]  "Although a class may contain a de minimis number of uninjured members, a court should deny class certification where the class definitions are overly broad."  *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 203 (D.D.C. 2024) (alterations adopted) (citations and internal quotation marks omitted).  Because of these commonality and typicality deficiencies, the Court declines to certify a class at this time.

### III.    Conclusion

For the aforementioned reasons, the Court denies K.Y. and D.J.'s Motion to Certify a Class, ECF 2.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE: January 16, 2026

CARL J. NICHOLS
United States District Judge

---

[4] Notably, data from the Office of Independent Juvenile Justice Facilities Oversight show that the 25th percentile for the number days spent in commitment at the Center is often less than ten days when tracked across the month of commitment.  *See* Office of Independent Juvenile Justice Facilities Oversight, *DYRS Committed Population at the YSC*, https://oijjfo.dc.gov/page/dyrs-committed-population-ysc (last visited Jan. 16, 2026) (chart entitled "Days Confined as a Committed Youth at Release From the YSC, By Month of Admission or Conversion to Committed Status" showing, for example, that the 25th percentile length was six days for those first committed in January 2025, nine days for those first committed in May 2025, and seven days for those first committed in July 2025).  It is therefore doubtful that all but a de minimis number of the proposed class members have suffered or will suffer from the same violations alleged by K.Y. and D.J.